PEOPLE *v.* McLEAN.

1. INTOXICATING LIQUORS — CRIMINAL LAW — EVIDENCE — SUFFICIENCY.

In a prosecution for the unlawful possession of intoxicating liquor, evidence *held*, sufficient to sustain a conviction.

2. SAME—POSSESSION OF LIQUOR IN HOME—HUSBAND AND WIFE—PRESUMPTIONS.

Defendant's testimony that her husband had no knowledge that the liquor was in the house until the officials had taken it away, *held*, to overcome the presumption, if one existed, as contended by defendant, that the possession of the liquor was that of the husband rather than that of the wife.

Exceptions before judgment from Muskegon; Vanderwerp (John), J. Submitted April 16, 1920. (Docket No. 111.) Decided June 7, 1920.

Mabel McLean was convicted of violating the liquor law. Affirmed.

*Macdonald & Macdonald,* for appellant.

*Alex. J. Groesbeck,* Attorney General, *Christian A. Broek,* Prosecuting Attorney, and *Harry W. Jackson,* Assistant Prosecuting Attorney, for the people.

MOORE, C. J. The defendant was convicted of unlawfully having in her possession 11 quarts of intoxicating liquor. She has brought the case here by writ of error. Mrs. McLean was the keeper of a rooming house in Muskegon. She was married and lived with her husband who worked in one of the Muskegon factories.

Counsel claim, we quote from their brief:

"*First:* That there is nothing shown in the record

indicating in the slightest degree that the defendant possessed this liquor in the legal sense of the phrase, and

"*Second:* That the liquor found in the house must be, under the rules laid down by the courts, in the possession of the defendant's husband, by presumption, and such presumption has never been rebutted by the prosecution.

"Possession as a legal proposition has a somewhat different meaning than when the term is used in the ordinary affairs of life. It means more, usually, than the mere physical control of an article. It is more closely allied with enjoyment or prospective enjoyment, ownership and control. For instance, in the case of *Fuller* v. *Fuller.* 84 Me. 475 (24 Atl. 946), the court said:

"'The legal idea of "possession" though varying according to circumstances, still embraces the conception of right as well as that of physical control.'

"In the present case, admitting that the defendant or some member of her household had the physical control of the liquor found there, still it is contended here that there is nothing in the record that denies her claim that she had no right or title in the liquor, wanted none and in fact had demanded its removal."

The record discloses that a search warrant was obtained and a visit was made by officials to the rooming house kept by the defendant. Her grandfather lived with her. There was found by the officers in a suit case in a closet opening off from the bedroom of her grandfather 11 quarts of whisky. In his charge to the jury the claim of the defendant was stated by the trial judge as follows:

"The respondent claims that she is not guilty of this charge. She says that on the evening of the night before, that is, of the 10th day of April last, between eight and nine o'clock, a man whom she did not know came to her rooming house at 14 East Clay avenue in this city and had with him a suit case; that she invited him to come in the front sitting room adjoining the hall of the house; that after the man had sat down

in this room he asked her if she wanted to buy any whisky, and she told him she did not and did not want it in her house; that just at that time a man by the name of Trampos who kept a grocery store where the respondent did her trading, came into the room where respondent and the other man were to tell her that he had left some groceries she had ordered and had left them in her kitchen, and then in the next room asked the respondent what the other man wanted or had to sell and she told him; that the respondent was then called upstairs where she was for a short time, and that when she came back to the front room she found both Trampos and the other man gone, and she did not see any liquor or the suit case; that the next morning she was doing her work in and about her grandfather's room, and found the suit case and asked her grandfather how it came there and that the grandfather told her that Trampos and the other party had left it there the night before; and shortly before dinner she went to Trampos' store and asked him about the matter, and that he claimed to have bought the whisky the night before, and that Trampos asked her to allow it to be left in the closet or to place it in the closet of her house until after dinner, when he would come and get it, and that she told Trampos that she did not want it in her house and to come and get it as soon as he could, which he promised to do. The respondent claims that he had not called for it when the officers came there with a search warrant, between two and three o'clock. The respondent also claims that she didn't buy the whisky, didn't own it, and didn't know it was there until about ten o'clock of the morning of April 11th, and that she had done her best to get rid of it after learning that it was there.

"Now, gentlemen, if the respondent's version of this matter is true, that is if you find from the evidence that this suit case and contents of liquor was left there the night before by the stranger and Trampos after she had refused to buy it, and that she did not own it, and that when she found out it was there she made every effort as she claims to have it taken away from there, that is, as soon as she learned it was there on the morning of April 11th, then she is not guilty of this charge."

The defendant was sworn as a witness on her own behalf. We make extracts from her testimony as follows:

"I am thirty years old and married. I rent a house at the above address and keep roomers. I have no other business. I had been keeping roomers about three weeks on the 11th of April. My family consists of my grandfather and my husband. My grandfather is an invalid and so old that he can hardly get around. He can be up and around the house but cannot go out on the street. My husband works at the Continental."

She described the coming of a man to her house and what was said by him and by her, and continuing she said:

"* * * Trampos keeps a store on Western avenue and I do business with him. He delivers the goods to me. He came down the alley to the back door.

"Q. And he came into your room where you were?
"A. He did.

"Q. Did he deliver you some goods then?
"A. Yes, sir.

"Q. Was this suit case opened that this man carried at that time?
"A. No, it wasn't.

"Q. Did he hear what the man said to you?
"A. No. He asked me what the man had and I told him he had whisky and had tried to sell it to me.
* * *

"Q. The next day did you learn anything about that suit case?
"A. The next day when I was doing my work in my grandfather's room I found a suit case, and I asked my grandfather whose suit case it was and he said that that man from the store put it in there the night before.

"Q. About what time was that?
"A. That was ten or after in the forenoon of the next day.

"Q. What did you do then?
"A. I had to go to the store for groceries and I told

him that he had better take his whisky away, that I didn't want it there.

"*Q.* How did you know it was whisky?

"*A.* When I picked up the suit case I didn't look in it but I heard the bottles rattle. After I went to the store he told me he had bought it from the fellow the night before.

"*Q.* Did he tell you he would come and get it?

"*A.* He did. He told me to set the suit case in the closet and he would come after dinner and get it.

"*Q.* And that is where you found it?

"*A.* I found it in my grandfather's room.

"*Q.* Did the man come and get the—

"*A.* He didn't come. The officers came before he got there." * * *

On the cross-examination she said in part:

"*Q.* You said something like this, 'I don't want any whisky in the house?'

"*A.* Yes.

"*Q.* And he stayed right there sitting down, did he?

"*A.* He didn't have time to go before Mr. Trampos told him he would take it. Mr. Trampos came to deliver some groceries. He left them in the kitchen and came in to tell me he had brought them. He called me into the middle room.

"*Q.* What did he say to you?

"*A.* He asked me what that guy had in his suit case. I told him that I didn't know but he tried to sell me whisky. * * *

"*Q.* When did you first learn there was whisky in your place?

"*A.* The next day between ten and eleven. I went into my grandfather's room, and found the suit case, and he said that Spiros had put it there the night before. I moved the suit case, but did not open it. I put it in the closet. Then I went over to Trampos' store before dinner, and told him to get it. He said he would come and get it as soon as he got a chance to do so."

She also testified that her husband did not know the whisky was in the house until the evening of the day when the officers seized it in the afternoon.

Mr. Trampos was a witness, and, after being warned as to his constitutional rights, testified in part:

"*Q.* Do you know Mabel McLean?

"*A.* Yes, sir.  She lives at 14 East Clay avenue. My store is just back of her house.  Mrs. McLean trades with me and I deliver groceries to her house. I delivered some groceries to her house the night of April 10th.  I don't remember the time of night, but it was sometime between eight and nine o'clock.  It was after dark.  I went in the back door.

"*Q.* And who was there if anybody?

"*A.* Mrs. McLean was there at the time, and some other fellow.

"*Q.* Who was the other fellow?

"*A.* I don't know him.  I see him and I ask Mrs. McLean who it is.  She said 'I don't know who it is.' She told me 'he has got some whisky for sale.' * * *

"*Q.* Then what happened?

"*A.* I asked her, 'Who is this man?' and she say 'He has got some whisky for sale, but I don't want to buy it,' and at the same time she said 'you had better get out of my house; I don't want to buy anything.' That is what she said and at the same time she left the room and went upstairs, and after that he told me if I want to buy that whisky.  I take him to the next room.  He has the whisky in the suit case and I take him to the next room and I ask him about the whisky, if he wanted to sell it and I take it.  I take the suit case with the whisky, and I put it by the bedroom where her grandfather sleep, and I left her house. * * *  The next day she come to my store. I don't remember exactly when, but about noontime, something like that—and she tell me 'You come and take the whisky' because she don't want it, and she is going to throw it out if I don't take it, and I said to her, 'I am a little busy now,' because that was Friday and Friday I try to get ready for Saturday business.  I said: 'I have got no time to do that; I will be over sometime this afternoon; but this afternoon the officers come and take the whisky."

We have quoted enough of the testimony to show that Mrs. McLean had the whisky in her possession with knowledge of what it was stated to be at first,

and after a time with knowledge of what it was. She undertook to explain its possession in such a way as to relieve herself of the charge that her possession was a guilty possession.

We have quoted enough of the charge of the court to indicate that the jury showed by their verdict that they did not believe Mrs. McLean's version of the transaction. If any one has a right to complain of the charge it is not the defendant. In the present state of the law, when she found the whisky was in the house she would have done well to have notified the officers of the law instead of the person who had bought whisky in her house after she had told him that an effort had been made to sell her the whisky.

We now come to the second proposition of counsel that the presumption is that the possession of the whisky was the possession of Mr. McLean as the defendant was a married woman. Even if it be conceded that the contention is a proper one ordinarily, the testimony of Mrs. McLean, which we have quoted, overcomes the presumption. That testimony shows that she was conducting the business of a rooming house keeper and that her husband had no knowledge the whisky was in the house until after the officials had taken it away. We find no reversible error.

The record does not show whether sentence has been pronounced. If it has, the judgment is affirmed. If the case is here on exceptions before sentence the conviction is affirmed and the case is remanded for further proceedings.

. STEERE, BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.